**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERTO MUNIZ VASQUEZ,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security,<br><br>Defendant. | Case No. 1:11-cv-01899-SKO<br><br>**ORDER ON PLAINTIFF'S COMPLAINT**<br><br>(Doc. 31) |

## I.   INTRODUCTION

Plaintiff, Roberto Muniz Vasquez ("Plaintiff"), seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Disability Insurance Benefits ("DIB") benefits pursuant to Title II of the Social Security Act.  42 U.S.C. § 405(g).  The matter is currently before the Court on the parties' briefs, which were submitted,

without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

## II. FACTUAL BACKGROUND

Plaintiff was born on June 7, 1955, and alleges disability beginning on July 22, 2006. (AR 111; 136.) Plaintiff claims he is disabled due to seizures, colitis, and back pain. (*See* AR 93-9; 116; 130.)

### A. Relevant Medical Evidence

On October 5, 2001, Marilyn Benck, M.D., notified the Department of Motor Vehicles ("DMV") that Plaintiff had suffered a seizure with a lapse of consciousness on October 3, 2001, during his lunch hour at work. (AR 424.) Plaintiff's family reported a history of seizures beginning in 1994. (AR 424.) Dr. Benck noted Plaintiff "has not been under any type of treatment or physician's supervision for his seizures, nor has he had a full workup as to the type of seizures he's experiencing." (AR 424.)

Plaintiff sought treatment at Bautista Medical Group on October 4, 2005. (AR 174.) He complained of seizures and dizziness, abdominal bloatedness, heartburn, indigestion, abdominal gas, and bloody stools. (AR 174.) Plaintiff refused a referral to a gastroenterologist for a colonoscopy and was given advice on diet alterations to help with his symptoms. (AR 175.)

Plaintiff visited the emergency room in January and February 2006, when he was admitted to Community Medical Center after being struck in the head by a baseball bat and later to have his staples removed. (AR 158-59; 164-67; 426-28.) Imaging of Plaintiff's head on January 27, 2006, revealed bilateral soft tissue swelling and bilateral maxillary sinus mucous retention cyst or polyp, but indicated no evidence of acute intracranial abnormality. (AR 160; 168.) Imaging of Plaintiff's left elbow and right fingers were normal. (AR 161-62; 169-70.)

On August 17, 2006, Plaintiff reported seizures and low back pain, but appeared well-nourished and well-developed, with no deformities and full range of motion in the extremities. (AR 172-73.) Plaintiff was prescribed Dilantin, Tegretol, and Celebrex for his seizure symptoms. (AR 173.)

---

[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 9, 10.)

On November 18, 2006, internal medicine consultative examiner Rustom Damania, M.D., examined Plaintiff. (AR 176-80.) Plaintiff was observed to be well-built, well-nourished, and in no acute distress or discomfort. (AR 177.) Dr. Damania observed Plaintiff to be well-groomed, well-dressed, cooperative, and pleasant, with good eye contact. (AR 177.) Plaintiff did not use an assistive device, his gait was normal, his straight leg raise testing was negative in the seated and supine positions, he had full (5/5) motor strength, and he had normal reflexes and sensory exam. (AR 178.) An X-ray of the lumbar spine showed some mild narrowing of the L2-L3 disk and narrowing of the L5-S1 and L4-L5 disks, but was otherwise normal. (AR 180.) Dr. Damania opined Plaintiff could stand, walk, and sit for six hours, lift 50 pounds occasionally and 25 pounds frequently, and had no postural, manipulative, visual, or communicative limitations. (AR 178.) Dr. Damania noted Plaintiff required seizure precautions, and placed "[e]nvironmental limitations . . . on climbing and balancing secondary to [Plaintiff's] seizures[.]" (AR 178-79.)

On January 19, 2007, State agency physician B.J. Ginsburg, M.D., completed a physical residual functional capacity ("RFC") assessment. (AR 181-85.) Dr. Ginsburg opined Plaintiff could stand, walk, and sit for six hours out of an eight-hour days, and lift and carry 50 pounds occasionally and 25 pounds frequently. (AR 182.) Dr. Ginsburg opined Plaintiff was subject to "usual seizure precautions" and therefore could never climb ladders, ropes, and scaffolds, must avoid "concentrated exposure" to machinery and heights, but could frequently climb ramps and stairs. (AR 183-84.) Dr. Ginsburg identified no postural, manipulative, or communicative limitations, opining Plaintiff could also frequently balance, stoop, kneel, crouch, and crawl. (AR 183.) Dr. Ginsburg opined Plaintiff should avoid concentrated exposure to hazards. (AR 183-84.)

Plaintiff began treating with William Garnica, M.D., on April 6, 2007. (AR 189-90; 196.) In April 2007, physical examination findings were again mostly normal, with normal gait and normal range of motion. (AR 189-90.) Plaintiff reported back pain and bloody stool on August 3, 2007. (AR 472.) On September 29, 2007, Dr. Garnica noted that Plaintiff was unable to work due to chronic abdominal pain arising from his colitis. (AR 466.) On October 5, 2007, and January 21, 2008, Plaintiff reported gastrointestinal distress and abdominal pain, and requested a refill on

Vicodin. (AR 464; 465.) On March 25 and April 4, 2008, Plaintiff requested disability, alleging that he could not work. (AR 456; 463.) Plaintiff reported bloody stools and going to a hospital in Tijuana, and Dr. Garnica diagnosed ulcerative colitis but noted Plaintiff's condition was not a guarantee of disability. (AR 456; 463; 464.)

Blood tests on March 28, 2008, indicated that Plaintiff's Dilantin levels were low. (AR 457-60.) On August 6, 2008, Plaintiff reported having no seizures for a year, although his Dilantin levels were still low. (AR 453; 455.) On August 20, 2008, Dr. Garnica opined Plaintiff's epilepsy was stable. (AR 452.) During his office visit in October 2008, Dr. Garnica again observed Plaintiff's epilepsy was stable, but noted Plaintiff's low Dilantin levels and encouraged Plaintiff to resume his medication. (AR 451; 453).

Dr. Garnica also completed a medical source statement on October 16, 2008. (AR 196-200.) Dr. Garnica opined Plaintiff suffered from uncontrolled seizures and chronic headaches (AR 196), but noted an undated MRI of the brain was normal (AR 197). Dr. Garnica opined Plaintiff could occasionally balance, work at unprotected heights and extreme temperatures, and use moving machinery, but could frequently climb, stoop, kneel, bend at the waist, grasp, push and pull, crouch, crawl, and reach above the shoulder level. (AR 198.) However, Dr. Garnica opined Plaintiff was only capable of light work and must avoid heavy machinery, climbing ladders, and driving vehicles due to his epilepsy. (AR 199.) Although Dr. Garnica opined Plaintiff's symptoms were permanent, he expected improvement with continued treatment and opined that Plaintiff would be able to perform work at any exertional level with continued treatment. (AR 200.)

On October 28, 2008, Dr. Garnica noted Plaintiff asked him to fill out "Calwork" forms indicating he is unable to work due to his seizures and observed Plaintiff's colitis was stable. (AR 450.) On April 16 and again on July 16, 2009, Dr. Garnica noted Plaintiff's seizure disorder was stable and opined Plaintiff would be able to return to work within three months. (AR 448; 449.) On October 15, 2009, Plaintiff reported having seizures once or twice a week and Dr. Garnica opined he could return to work within a month (AR 447), and on October 22, 2009, Dr. Garnica noted that Plaintiff was noncompliant with his epilepsy treatment and would be able to

return to work within two months (AR 443). Dr. Garnica completed a state disability certification form on October 15, 2009, in which he opined without providing any diagnosis or specific limitations that Plaintiff could not work. (AR 441.) On December 22, 2009, Plaintiff was seen for a sore throat and his seizure medication levels were again low. (AR 438-40.)

On April 15, July 29, September 2, and September 10, 2010, Dr. Garnica observed Plaintiff's epilepsy was "stable." (AR 433; 434; 435; 436.) On January 13, 2011, Dr. Garnica noted that Plaintiff had not had any events in the last year and opined Plaintiff's epilepsy was stable. (AR 430; 688.) Noting that Plaintiff reported three seizures in the past month, Dr. Garnica opined Plaintiff's epilepsy was stable but Plaintiff was noncompliant with his treatment on July 14, 2011 (AR 684), and a lab report showed low levels of Dilantin on July 15, 2011 (AR 689). Plaintiff went to the emergency room at Community Regional Medical Center on July 18, 2011, for a single episode of loss of consciousness after a seizure, and his Dilantin levels were again low (AR 695-96; 699.) After being given Dilantin, Plaintiff returned to baseline and was discharged. (AR 695-96.)

On July 28, 2011, Dr. Garnica observed Plaintiff was not compliant with treatment and Plaintiff's epilepsy was uncontrolled. (AR 685.) On August 25, 2011, Dr. Garnica opined Plaintiff would be able to return to work within three weeks (AR 684; 721), but on September 11, 2011, Plaintiff was admitted to the emergency room for repeated seizures lasting three minutes. (AR 697-98.) Plaintiff was given a refill of Dilantin and follow-up was recommended (AR 697-98), and lab reports again indicated low levels of Dilantin (AR 700). On October 22, 2011, Plaintiff went to the emergency room after a single seizure lasting two to five minute and accompanied by an aura. (AR 701.) Lab reports indicated Plaintiff's Dilantin levels were again low, and he was prescribed Dilantin to bring his levels up. (AR 703-05).

On October 11, 2011, Plaintiff underwent an internal medicine consultative examination with Tomas Rios, M.D. (AR 690-93.) Dr. Rios observed Plaintiff to be well-developed and well-nourished, alert and oriented, and with intact gross cognitive and memory function. (AR 691-92.) Plaintiff's gait was normal and he did not use an assistive device, he moved with ease, and had good range of motion in the shoulders and hips and some tenderness in the region between the

thigh and pelvis. (AR 691-93.) Plaintiff had full (5/5) strength throughout with normal muscle bulk and tone, and light touch and pinprick were intact throughout the upper and lower extremities. (AR 693.) Dr. Rios opined Plaintiff could stand, walk, and sit for six hours and lift 50 pounds occasionally and 25 pounds frequently, and could frequently climb, balance, stoop, kneel, crouch, crawl, reach, handle, finger, and feel. (AR 693.) Dr. Rios also noted Plaintiff should be prohibited from working at heights and around heavy machinery due to his seizure disorder. (AR 693.)

On October 26, 2011, State agency physician A. Nasrabadi, M.D., completed a physical RFC assessment. (AR 708-12.) Dr. Nasrabadi opined Plaintiff could stand, walk, and sit for six hours in an eight-hour day and could lift and carry 50 pounds occasionally and 25 pounds frequently. (AR 709.) He further opined Plaintiff could never climb ladders, ropes, and scaffolds and should avoid concentrated exposure to hazards, but could frequently balance, stoop, kneel, crouch, and crawl. (AR 710-11.) Dr. Nasrabadi assessed no manipulative, visual, or communicative limitations. (AR 710-11.) In his case analysis, Dr. Nasrabadi opined Plaintiff's seizures were "not of such frequency, intensity & severity as to meet/[equal] the listings." (AR 714.)

In November of 2011, Dr. Garnica noted that Plaintiff's last seizure had been on October 19, 2011, but opined that Plaintiff's epilepsy was controlled and Plaintiff could return to work in three months. (AR 720.) On February 6, 2012, Dr. Garnia noted Plaintiff's last seizure had been in November of 2011 and opined Plaintiff's epilepsy was stable. (AR 719.) On April 4, 2012, lab results again showed Plaintiff's Dilantin levels were low. (AR 718.) On June 7, 2012, Dr. Garnica observed Plaintiff was compliant with his medication, was not having major seizures, and therefore opined his epilepsy was stable. (AR 717.) On December 6, 2012, Dr. Garnica observed that Plaintiff's epilepsy was stable, and scheduled a follow-up appointment for June of 2013. (AR 716.)

**C.    Testimony**

    **1.    Written Testimony**

In his Adult Disability Form completed on August 9, 2006, Plaintiff claimed he was unable

to work because he has "seizures on the job which [are] a danger to myself and co-workers (operating equipment) [because] after a seizure it is hard to concentrate, remember instructions, [and] I am not functional after a seizure for many hours." (AR 116.)

In his Seizure Questionnaire completed on September 5, 2006, Plaintiff stated that he has been having one to two seizures per month since 1983. (AR 123.) Plaintiff's seizures were accompanied by convulsions, biting his tongue, urinary incontinence, and loss of consciousness, and lasted 5-10 minutes. (AR 123.) After a seizure, Plaintiff stated he becomes sore and has a migraine headache, and is unable to resume normal activities for three to four hours after regaining consciousness. (AR 123.)

In his Headache Questionnaire completed on June 6, 2007, Plaintiff stated that he has been having daily severe headaches since June 2004, which last as long as he is "outside [his] house." (AR 139.) According to Plaintiff, the left side of his head becomes "very heavy" and he feels pressure, tension, heat, and vibration. (AR 239.) He attributed the headaches to his epilepsy, and noted that his medication "helps [him] to prevent severe epilepsy attacks from happening[,] [a]lthough [he] do[es] suffer from mild epilepsy attacks." (AR 140.)

In an undated appeal disability report, Plaintiff stated that he was working as a forklift driver at Wawona Frozen Foods, and starting in May 2007 he became "afraid" he would lose his job because his epilepsy attacks had increased to twice a week "due to fatigue at work." (AR 148.) According to Plaintiff,

> It[']s hard for me to focus on my job, since I tend to forget what I'm doing. I suffer from memory loss. Sometimes when I'm driving I get dizzy and lose control of the forklift. I suffered from severe headaches because I forced myself to remain focus[ed] on my job. Currently I'm having problems with my sight and I'm loosing (*sic*) my sense of hearing. Some of the medications I'm taking have secondary effects which caused me diar[r]hea and stomachaches.

(AR 148.) Further, Plaintiff stated that

//

> My epilepsy has caused me to lose four of my jobs, since I have had four accidents at work while I was driving the forklift. This cause[d] my license to be suspended, now I'm driving when it[']s necessary without a license, since I'm not currently receiving any kind of assistance. I asked [my doctor] to write a letter

7

asking DMV to give me my license back, but he refused to do so, since he recognized I'm not fully capable of [ ] driving.

(AR 253.)

### D. Hearing Testimony

#### 1. Plaintiff's Testimony

Plaintiff testified that he had attended school in Mexico through sixth grade and could understand "a little" English. (AR 267.) He lived with his girlfriend and two children (AR 266), and was independent in his activities of daily living (AR 267-78). Plaintiff testified he independently showers and dresses, cleans, cooks, and uses the microwave, and occasionally shops. (AR 267-78.) On an average day, Plaintiff studies the Bible and then cleans, and will sometimes take his son to the park and watch television. (AR 268.)

Plaintiff testified that he suffers from seizures twice a week (AR 270.) During a seizure, Plaintiff tightens his jaw and teeth, leaving his mouth and tongue sore. (AR 271.) He used to suffer from bowel incontinence and tongue biting during seizures, but does not any longer. (AR 270.) After a seizure Plaintiff feels "powerless, down, out of [his] mind," with a very low energy level lasting from six hours up to a full day. (AR 275-76.) He testified he last suffered from a seizure two days before the hearing. (AR 271.) Plaintiff testified that he was taking his Dilantin, but was not taking his other medications because he could not afford them. (AR 271.) He also testified that he does not have any side effects from his medication. (AR 276.)

Plaintiff also alleged chronic pain in his lower back and right shoulder. (AR 271-72.) Plaintiff stated that the he is unable to lift heavy objects due to pain and a "popping" in his right shoulder. (AR 272.) Plaintiff noted that his back pain "comes and goes" and occasionally will hurt more after a seizure (AR 272.)

Plaintiff testified that he could lift up to 30 pounds, sit and stand for an hour a time, and walk up to a mile without "any problems." (AR 273.) He also testified that he had difficulty "sometimes" with bending over and picking up items off the floor, because after a seizure he is unable to "bend over very well." (AR 273-74.) Plaintiff testified that he is able to stoop without difficulty four hours a day, and can kneel and climb a ladder and stairs. (AR 274.) Plaintiff was unsure whether he had difficulty balancing because he had not worked "for a while." (AR 275.)

8

The ALJ asked Plaintiff to

Q    . . . tell me in your own words, why do you feel you can't work?

A    Well, in, in my own words, I can work, I think. The reasons why I haven't looked for work right now is because of the accidents I've had. And after harming my own self, I don't want to harm other people. Like, at [a prior] job, I was moving in my forklift, and I crashed against a pole. If the pole didn't stop me, I would have knocked over the men that were working.

Q    So, when you're having a seizure, and you're working, do you miss the next day of work?

A    Well, yes, because I'm bruised up.

Q    An has –

A    And if I don't want to miss out, well, I'll go even that way.

Q    So, which is it? Do you go, or do you miss it?

A    Well, I go many times, because I also don't like to miss work.

Q    Have you missed work?

A    Hardly. Not that I can remember.

(AR 276-77.) Finally, Plaintiff asked the ALJ, if the ALJ denied benefits, "could [he] give [Plaintiff his] license back so that [he] could work?" (AR 280.) The ALJ informed Plaintiff that automotive licenses were the province of the State and he was unable to help Plaintiff. (AR 280-81.)

**2.    Vocational Expert's Testimony**

The ALJ posed three hypothetical questions to the Vocational Expert ("VE"). (AR 278-79.) First, the ALJ asked the VE whether a hypothetical person of Plaintiff's same age, education, language, and work background, who could lift and carry 50 pounds occasionally and 25 pounds frequently, sit, stand, or walk six hours out of eight hours in a day, and was subject to seizure precautions with no climbing ladders, ropes, or scaffolds, working at heights, driving, or working around dangerous machinery could perform any of Plaintiff's past work or any other work. (AR 278.) The VE testified that such a person could not perform any of Plaintiff's past work but could work as a Cleaner II, DOT 919.687-014, industrial cleaner, DOT 361.687-018, or hand packer, DOT 920.587-018. (AR 278.)

In the second hypothetical, the ALJ asked the VE whether a hypothetical person who could lift and carry 20 pounds occasionally and 10 pounds frequently, sit, stand, and walk six hours out

of eight hours in a day, occasionally stoop, crouch, crawl, and climb, and was subject to seizure precautions with no climbing ladders, ropes, or scaffolds, driving, or exposure to heights or dangerous machinery could perform any of Plaintiff's past work or any other work. (AR 278.) The VE testified that such a person could work as an inspector, DOT 920.685-026, electronics worker, DOT 726.687-010, or laundry worker, 361.587-010. (AR 278.)

In the third hypothetical, the ALJ added to the first hypothetical the limitation that such a person would miss four days of work a month. (AR 278-79.) The VE testified that such a person would not be able to work. (AR 279.)

Plaintiff's attorney added to the ALJ's first hypothetical the limitation that such a person could "never balance, and all the rest is the same." (AR 279.) The VE testified that his response would not change, that such a person was capable of working as a Cleaner II, DOT 919.687-014, industrial cleaner, DOT 361.687-018, or hand packer, DOT 920.587-018. (AR 279.)

**C.     Administrative Proceedings**

On March 26, 2009, the ALJ issued his first decision finding Plaintiff not disabled. (AR 16-22; 285-91.) Plaintiff appealed the decision, and the parties stipulated to remand the case for reconsideration of the medical evidence on June 29, 2010. (AR 213-14; 216-17; 297-99.) On June 10, 2011, the ALJ issued his second decision finding Plaintiff not disabled. (AR 224-31.) Plaintiff again appealed the decision, and the parties stipulated to remand the case on March 19, 2012, because significant portions of the recording of the hearing were inaudible. (Docs. 11; 12.)

On February 22, 2013, the ALJ issued his third decision finding Plaintiff not disabled. (AR 244-55.) The ALJ found that Plaintiff had two severe impairments, a seizure disorder and lumbar degenerative joint disease. (AR 247.) The ALJ determined that these impairment did not meet or equal a listed impairment. (AR 248.) The ALJ found Plaintiff retained the residual functional capacity ("RFC") to lift and carry 50 pounds occasionally and 25 pounds frequently and is able to stand, sit, and walk for a total of six to eight hours in an eight-hour workday; is unable to climb ladders, ropes, and scaffolds, work at unprotected heights or around dangerous moving machinery, and is unable to drive automotive equipment. (AR 248.) Given this RFC, the ALJ found Plaintiff was capable of performing the requirements of representative occupations Cleaner

II (DOT code 919.687-014), Industrial Cleaner (DOT code 381.687-018), and Hand Packager (DOT code 920.587-018). (AR 254-55.) The ALJ concluded that Plaintiff was not disabled, as defined in the Social Security Act, from July 22, 2006, the alleged onset date, through December 31, 2012, the date last insured. (AR 255.)

**D.     Plaintiff's Complaint**

On November 11, 2011, Plaintiff filed a complaint before this Court seeking review of the ALJ's 2011 decision. (Doc. 1.) The parties stipulated to remand the case for a new hearing under Sentence Six (Docs. 11, 12), and Plaintiff was again denied benefits. Plaintiff appealed the unfavorable decision, and the parties stipulated to reopen the case pursuant to the Court's retained Sentence Six jurisdiction. (Docs. 22, 23.) Plaintiff argues that the ALJ's assessed RFC is inconsistent with the examining opinion of Dr. Damania and the ALJ erroneously relied on the VE's testimony. (Doc. 28.)

## III.     SCOPE OF REVIEW

The Commissioner's decision that a claimant is not disabled will be upheld by a district court if the findings of fact are supported by substantial evidence in the record and the proper legal standards were applied. 42 U.S.C. § 405(g); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007); *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Davis v. Heckler*, 868 F.2d 323, 325 (9th Cir. 1989); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999); *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999); *Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985) (the findings of the Commissioner as to *any* fact, if supported by substantial evidence, are conclusive.) Substantial evidence is more than a mere scintilla, but less than a preponderance. *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008); *Saelee v. Chater*, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). "While inferences from the record can constitute substantial evidence, only those 'reasonably drawn from the record' will suffice." *Widmark v. Barnhart*, 454 F.3d 1063, 1066 (9th Cir. 2006) (citation omitted); *see also Desrosiers v. Sec'y of Health and*

11

Case 1:11-cv-01899-SKO   Document 31   Filed 03/24/15   Page 12 of 20

*Hum. Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (the Court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion.") The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

The role of the Court is *not* to substitute its discretion in the place of the ALJ – "[t]he ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted); *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002); *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995); *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (the court may review only the reasons stated by the ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not rely."); *Sprague v. Bowen*, 812 F.2d 1226, 1229-30 (9th Cir. 1987) (if substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive). The court will not reverse the Commissioner's decision if it is based on harmless error, which exists only when it is "clear from the record that an ALJ's error was 'inconsequential to the ultimate nondisability determination.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006) (quoting *Stout v. Comm'r*, 454 F.3d 1050, 1055 (9th Cir. 2006)); *see also Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

### IV.   APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A),

12

1382c(a)(3) (A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability. In Step 1, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the ALJ must determine at Step 2 whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities. *Id.* §§ 404.1520(c), 416.920(c). If so, the ALJ moves to Step 3 and determines whether the claimant has a severe impairment or combination of impairments that meet or equal the requirements of the Listing of Impairments ("Listing"), 20 § 404, Subpart P, App. 1, and is therefore presumptively disabled. *Id.* §§ 404.1520(d), 416.920(d). If not, at Step 4 the ALJ must determine whether the claimant has sufficient RFC despite the impairment or various limitations to perform her past work. *Id.* §§ 404.1520(f), 416.920(f). If not, at Step 5, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id.* §§ 404.1520(g), 416.920(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V.   DISCUSSION

### A.   Substantial Evidence Supports the ALJ's Finding that Plaintiff is not Disabled

Plaintiff argues that the ALJ's assessed RFC is inconsistent with the examining opinion of Dr. Damania and the ALJ erroneously relied on the VE's testimony. (Doc. 28.) The Commissioner contends that substantial evidence in the record supports the ALJ's assessed RFC and that any error in the ALJ's failure to explicitly include a limitation in balancing in the RFC was harmless. (Doc. 30.)

### 1. The ALJ Properly Considered the Limiting Effects of Plaintiff's Mental and Physical Impairments in Formulating Plaintiff's RFC

The ALJ found that Plaintiff has severe impairments of a seizure disorder and lumbar degenerative joint disease. (AR 247.) The ALJ considered whether Plaintiff's seizure disorder met Listing 11.01, but concluded that because Plaintiff does not have grand mal seizures more frequently than once a month or petit mal seizures more frequently than once [a] week, in spite of at least three months of prescribed treatment" his impairment does not meet or medically equal the severity of the Listing. (AR 248.) The ALJ found Plaintiff retained the residual functional capacity ("RFC") to lift and carry 50 pounds occasionally and 25 pounds frequently and is able to stand, sit, and walk for a total of six to eight hours in an eight-hour workday; is unable to climb ladders, ropes, and scaffolds, work at unprotected heights or around dangerous moving machinery, and is unable to drive automotive equipment. (AR 248.) Given this RFC, the ALJ found Plaintiff was capable of performing the requirements of representative occupations Cleaner II (DOT code 919.687-014), Industrial Cleaner (DOT code 381.687-018), and Hand Packager (DOT code 920.587-018). (AR 254-55.)

The RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling ("SSR") 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id*. "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

The determination of a claimant's RFC is wholly within the province of the ALJ. *See* SSR 96-8p. The RFC assessment is based on all the evidence in the record, and it is the ALJ's duty to consider and weigh that evidence. *See id.* Here, the ALJ noted that his RFC assessment was "consistent with" Dr. Damania's opinion. (AR 249.) Plaintiff asserts that the ALJ actually

failed to properly incorporate Dr. Damania's opined limitations into the RFC, because the ALJ gave "great weight to Dr[.] Damania's opinion regarding [Plaintiff's] lack of functional ability in climbing but reject[ed] Dr. Damania's specific limitation[s] with respect to balancing." (Doc. 28, 7.)

Dr. Damania specifically opined that Plaintiff would be limited in "climbing and balancing secondary to his seizures and required seizure precautions." (AR 179.) This is not, however, an absolute prohibition on either "climbing" or "balancing," and as the Commissioner points out, a limitation largely consistent with the opinions of Dr. Ginsburg (AR 183-84 (medium work with limitations to "frequently" balance and climb ramps and stairs, to avoid "concentrated exposure" to machinery and heights, and to never climb ladders, ropes, and scaffolds)), Dr. Rios (AR 693 (medium work with limitations to "frequently" climb and balance and to avoid working at heights or around heavy machinery)), and Dr. Garnica (AR 250-51 (light work with limitations to "occasionally" balance and "frequently" climb and to avoid heavy machinery)), to whom the ALJ accorded less weight *but did not reject*. (AR 250-52.)

Every medical opinion supported a limitation on balancing and climbing stairs and ramps, with the most restrictive also prohibiting climbing "ladders, ropes and scaffolds" and working at "unprotected heights." (*See* AR 179; 183-84; 250-51; 693.) They did not, however, "prohibit" Plaintiff from balancing or climbing stairs and ramps. In light of the medical evidence, the ALJ properly determined Plaintiff is unable to (1) climb ladders, ropes, and scaffolds and (2) work at unprotected heights or around dangerous moving machinery. (AR 248.) The ALJ was not required to incorporate into his assessed RFC additional impairments that were not supported by the medical evidence. *See Robbins v. Soc. Sec. Admin.*, 466 F.3d at 883.

Contrary to Plaintiff's contentions, the record as a whole does not support a blanket prohibition on balancing and climbing. For example, at the hearing, Plaintiff testified he *can* climb a ladder and stairs. (AR 274.) As to other postural limitations, Plaintiff testified that while he is unable to "bend over very well" immediately following a seizure (AR 273-74), he has no trouble kneeling or walking a mile (AR 274). Further, although Plaintiff was unsure whether he had difficulty balancing because he had not worked and therefore not balanced "for a while"

(AR 275), he is able to stoop "without difficulty" four hours in an eight-hour day (AR 274).

When asked, directly and unambiguously why he "cannot work," Plaintiff responded "[w]ell, in, in my own words, I can work, I think." (AR 276.) Plaintiff expressed worry that he would get in another accident while operating a forklift as his primary motivation for not looking for work. (AR 276-77.) When asked whether his seizures actually *caused* Plaintiff to miss work, Plaintiff said that he will sometimes miss the day of work after a seizure due to soreness, but "if I don't want to miss out, well, I'll go even that way . . . . I go many times, because I also don't like to miss work." (AR 277.) When the ALJ asked whether Plaintiff's epilepsy had *prevented* Plaintiff from attending work, Plaintiff responded: "Hardly. Not that I can remember." (AR 277.)

Further, while Plaintiff testified he has seizures twice a week (AR 270), the overall record indicates that so long as Plaintiff is compliant with his epilepsy medication,[2] his epilepsy is "stable" and he goes long periods of up to a year at a time without having a seizure.[3] The medical record demonstrates that Plaintiff's epilepsy is controlled when he is complaint with his medication, and interpreting Dr. Damania's opinion that Plaintiff is *limited* in climbing and balancing due to seizure precautions as a blanket *prohibition* on either climbing or balancing is untenable.

In sum, no medical source opined Plaintiff was unable to balance or climb stairs and ramps (*see* AR 179; 183-84; 250-51; 693) and Plaintiff testified he has no limitations in climbing

---

[2] Plaintiff was repeatedly noted to be noncompliant with his medication. (*See* AR 457-60 (Plaintiff's Dilantin levels low on March 28, 2008); 453 (Dilantin levels low on October 16, 2008, and Plaintiff encourage to "resume" his medication); 443 (Plaintiff "uncompliant" with his epilepsy treatment); 438-40 (seizure medication levels low on December 22, 2009); 684-89 (Plaintiff "noncompliant" with his medication on July 14, 2011); 685 (Plaintiff "not compliant" with treatment and epilepsy "uncontrolled" on July 28, 2011); 718 (Dilantin levels low on April 4, 2012). In fact, on the three occasions in the fall of 2011 when Plaintiff was hospitalized for a seizure event, it was clear that he was not complaint with his medication. (*See* AR 695-96 (Dilantin levels low at admission post-loss of consciousness after a seizure; after being given Dilantin, Plaintiff returned to "baseline" and was discharged); 697-98 (Dilantin levels low at admission post-multiple seizures; given a refill of Dilantin); 701-05 (Dilantin levels low at admission post-seizure; prescribed Dilantin to bring his levels up).

[3] *See, e.g.,* AR 453 (on August 6, 2008, Plaintiff had gone a full year without a seizure); 452 (epilepsy "stable" on August 20, 2008); 451 (epilepsy "stable" in October 2008); 448-49 (seizure disorder "stable" in April 2009); 436 (epilepsy "stable" on April 15, 2010); 435 (epilepsy "stable" on July 29, 2010); 434 (epilepsy "stable" on September 2, 2010); 430 (epilepsy "stable" on January 13, 2011 and Plaintiff had gone a full year without a seizure); 720 (epilepsy "controlled" in November 2011); 719 (epilepsy "stable" on February 6, 2012); 717 (epilepsy "stable" and Plaintiff "compliant" with his medication and "not having major seizures" on June 7, 2012); 716 (epilepsy "stable" on December 6, 2012).

(AR 274). Further, the medical record demonstrated Plaintiff's seizures are controlled and stable as long as he is taking his medication. (*See* 430-53; 457-60; 701-20.) The ALJ properly considered the limiting effects of Plaintiff's mental and physical impairments in formulating Plaintiff's RFC and the RFC is supported by substantial evidence in the record.

### 2. The ALJ Properly Relied on the VE's Testimony

Plaintiff argues that even if the ALJ properly formulated Plaintiff's RFC to incorporate all the impairments to which Dr. Damania opined, the VE's testimony cannot be relied upon because it conflicts with the DOT. (Doc. 28, 11-13.) The Commissioner contends that the DOT job description of Cleaner II, industrial cleaner, and hand packager do not contain any requirement to climb ladders, ropes, or scaffolds, and therefore Plaintiff is not precluded from performing these jobs. (Doc. 30, 11.) Further, the Commissioner contends that even if the Court finds that Plaintiff is precluded from performing the jobs Cleaner II and industrial cleaner, which both require occasional climbing, Plaintiff can still work as a hand packager, a job which does not require any climbing and exists in significant numbers in the national economy. (Doc. 30, 11.)

Hypothetical questions posed to the VE must set out all the substantial, supported limitations and restrictions of the particular claimant. *See Magallanes*, 881 F.2d at 756; *Embrey*, 849 F.2d at 422. Hypothetical questions may exclude those alleged limitations the ALJ finds do not exist based on substantial evidence, *Rollins*, 261 F.3d at 857, but must set out *all* the claimant's limitations for the VE's testimony to have evidentiary value. *See DeLorme v. Sullivan*, 924 F.2d 841, 850 (9th Cir. 1991). While the ALJ may pose a range of hypothetical questions based on alternate interpretations of the evidence, the hypothetical that ultimately serves as the basis for the ALJ's determination must be supported by substantial evidence in the record as a whole. *See Embry*, 849 F.2d at 422-23.

As discussed above, the ALJ properly determined Plaintiff retained the RFC to lift and carry 50 pounds occasionally and 25 pounds frequently and is able to stand, sit, and walk for a total of six to eight hours in an eight-hour workday; is unable to climb ladders, ropes, and scaffolds, work at unprotected heights or around dangerous moving machinery, and is unable to drive automotive equipment. (AR 248.) In his hypothetical to the VE, the ALJ asked if a person

who could lift and carry 50 pounds occasionally and 25 pounds frequently, sit, stand, or walk six hours out of eight hours in a day, and is unable to climb ladders, ropes, or scaffolds, work at heights, drive, and work around dangerous machinery would be able to work. (AR 278.) This hypothetical is virtually identical to the ALJ's assessment of Plaintiff's RFC. (*Compare* AR 248 *with* 278.)

In response, the VE testified that such a person could work as a Cleaner II, DOT 919.687-014, industrial cleaner, DOT 361.687-018, or hand packager, DOT 920.587-018. (AR 278.) According to the DOT, the job Cleaner II requires occasional climbing and no balancing, *see* DICOT 919.687-014, the job industrial cleaner requires occasional climbing and occasional balancing, *see* DICOT 361.687-018, and the job hand packager requires no climbing and occasional balancing, *see* DICOT 920.587-018. Plaintiff argues that the VE's testimony that Plaintiff could perform these jobs conflicts with the DOT definitions, and the ALJ failed to elicit an explanation for that conflict. (Doc. 28, 11-13.)

        **a.**     **Climbing**

Plaintiff contends the requirement for occasional climbing is "incompatible with the limitation and preclusion . . . from climbing as described by Dr. Damania[.]" (Doc. 28, 12.) Contrary to Plaintiff's argument, however, Dr. Damania never opined that Plaintiff was unable to climb – he opined Plaintiff was subject to seizure precautions, and therefore limited in his ability to climb. (AR 179.) The ALJ's hypothetical to the VE was actually more restrictive than the limitation Dr. Damania had opined to – the ALJ posed a hypothetical prohibiting any climbing of ropes, ladders, or scaffolds. (AR 278.) The "occasional" climbing requirement for the cleaner II and industrial cleaner job descriptions does not conflict with Dr. Damania's "limitation on climbing."

Plaintiff argues that "occasional climbing" for these two jobs will necessarily require climbing of ropes, ladders, or scaffolds, and therefore also conflicts with the ALJ's assessment of Plaintiff's RFC. (Doc. 28, 11.) *See* Selected Characteristics of Occupations Defined in the Revised DOT ("SCO"), Appendix C (describing climbing as "ascending or descending ladders, stairs, scaffolding, ramps, poles, and the like, using feet and legs or hands and arms."). However,

a review of the job duties for these occupations shows that they do not require climbing of ladders, scaffolding, or ropes. *See* DICOT 919.687-014 (Cleaner II job entails cleaning "interiors and exteriors of transportation vehicles," and "using spraying equipment, brush, or sponge"), 381.687-018 (industrial cleaner job entails keeping "working areas in production departments of industrial establishment in clean and orderly condition" and transporting items between departments or buildings, arranging materials or industrial equipment in a neat and orderly manner, picking up refuse from plant grounds, cutting grass, and shoveling snow).

Further, the Court notes that "[r]elatively few jobs in the national economy require ascending or descending ladders and scaffolding." 4 Soc. Sec. Disab. Claims Prac. & Proc. Appendix 2 (2nd ed.) The Commissioner has acknowledged that limitations on climbing ramps and stairs can have varying effects on the occupational base; however,

> **Where a person has some limitation in climbing and balancing and it is the only limitation, it would not ordinarily have a significant impact on the broad world of work.** Certain occupations, however, may be ruled out; e.g., the light occupation of construction painter, which requires climbing ladders and scaffolding, and the very heavy occupation of fire-fighter, which sometimes requires the individual to climb poles and ropes.

SSR 85-15 at 6 (emphasis added); *see Rangel v. Astrue*, No. 1:06-CV-00884-SMS, 2008 WL 215190 at *5 (E.D. Cal. Jan. 24, 2008). Here, every single credited medical source agreed Plaintiff retained the ability to climb structures other than ladders, ropes, or scaffolds. (*See* AR 179 (Dr. Damania opined Plaintiff would be "limited" in "climbing"); 183-84 (Dr. Ginsburg (opined Plaintiff could "frequently" climb ramps and stairs but could never climb ropes, ladders, and scaffolds); 693 (Dr. Rios opined Plaintiff could "frequently" climb); 250-51 (Dr. Garnica opined Plaintiff could "frequently" climb).) Further, Plaintiff testified at the hearing that he can climb *both* a ladder and stairs. (AR 274.) Because Plaintiff retained the ability to climb occasionally, the VE's testimony that he could perform the jobs of Cleaner II and industrial cleaner was not in conflict with the DOT and the ALJ did not err in relying on the VE's testimony.

      **b.**    **Balancing**

Plaintiff further contends the requirement for occasional balancing is incompatible with "Dr. Damania's clear limitation on balancing." (Doc. 28, 12.) Plaintiff argues the "occasional balancing demands of the alternative work of industrial cleaner and hand packager as described in the DOT are incompatible with the limitation and preclusion of [Plaintiff] from balancing as described by Dr. Damania and found consistent by the ALJ." (Doc. 28, 13.) Contrary to Plaintiff's argument, Dr. Damania never opined Plaintiff was unable to balance – he opined Plaintiff was subject to seizure precautions, and therefore "limited" in his ability to balance. (AR 179.) As discussed above, a "limitation" on balancing due to seizure precautions is not the same thing as a prohibition on any sort of balancing entirely. Further, every single credited medical source agreed Plaintiff retained the ability to balance. (*See* AR 179 (Dr. Damania opined Plaintiff would be "limited" in "balancing"); 183-84 (Dr. Ginsburg opined Plaintiff could "frequently" balance); 693 (Dr. Rios opined Plaintiff could "frequently" balance); 250-51 (Dr. Garnica opined Plaintiff could "occasionally" balance).) The "occasional" balancing requirement for the industrial cleaner and hand packager DOT descriptions does not conflict with Dr. Damania's "limitation" on balancing.

Because Plaintiff retained the ability to balance occasionally, the VE's testimony that he could perform the jobs of industrial cleaner and hand packager was not in conflict with the DOT and the ALJ did not error in relying on the VE's testimony.

### VI.   CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, the Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security and against Plaintiff Roberto Muniz Vasquez.

IT IS SO ORDERED.

Dated:  **March 23, 2015**                     /s/ Sheila K. Oberto
                                                                  UNITED STATES MAGISTRATE JUDGE